166 So.2d 77 (1964)
Robert H. JAMES and his wife, Jean James, Plaintiffs and Appellees,
v.
CHILDS, DIVISION OF KROGER COMPANY, Defendant and Appellee, and
Coca-Cola Bottling Company of Lake Charles, Inc., Defendant and Appellant.
No. 1176.
Court of Appeal of Louisiana, Third Circuit.
June 24, 1964.
Rehearing Denied July 15, 1964.
*78 Cavanaugh, Hickman, Brame & Holt, by Edmund E. Woodley, Lake Charles, for defendant-appellant-appellee.
Earl E. Veron, Lake Charles, for plaintiff-appellee-appellant.
Hall, Raggio & Farrar, by R. W. Farrar, Jr., Lake Charles, for defendant-appellee.
Jones, Kimball, Harper, Tete & Wetherill, by William R. Tete, Lake Charles, for thirdparty defendant.
Before TATE, FRUGE and CULPEPPER, JJ.
CULPEPPER, Judge.
This is a suit for damages arising out of an accident in which Mrs. Jean James sustained a laceration of her ankle when two or three Coca-Cola bottles fell through the bottom of a paper carton and burst. The coke carton was being moved from a grocery cart to Mrs. James's car by an employee of Childs store. Plaintiffs sued both Childs and the Coca-Cola Bottling Company of Lake Charles. After a trial on the merits the district judge held that the accident was caused solely by the negligence of the Coca-Cola Bottling Company. No negligence was found on the part of Childs. The defendant, Coca-Cola Bottling Company, has appealed. Plaintiffs answered the appeal, seeking increases in the awards.
The facts of the accident itself are virtually undisputed. Mrs. Jean James took the six-bottle carton of "King Size" cokes from the Coca-Cola Company's display in Childs self-service grocery store. She placed the carton, along with other groceries, on a push cart. After going through the check-out counter the cokes and other groceries were taken in the same cart, or another cart, by a "bag-boy" to Mrs. James's car. The bag-boy picked up the carton of cokes by the handle and was in the process of transferring them from the push cart to the car when the bottom of the paper carton gave way on one end. Two or three bottles fell to the paved parking lot. At least one bottle exploded and a piece of glass cut the right ankle of Mrs. James who was standing near the car. Unfortunately, the offending carton was later lost, but the testimony of the bag-boy and Mrs. James, who actually saw the coke bottles fall through the bottom of the carton, as well as the testimony of the store manager, who later inspected the carton, is uncontradicted to the effect that the bottom of the carton gave way on one end and caused the bottles to fall.
The first issue is whether the doctrine of res ipsa loquitur is applicable to the defendant, Coca-Cola Bottling Company. A succinct statement of the applicable law regarding res ipsa loquitur is found in the concurring opinion of Justice Sanders in the recent case of Pilie v. National Food Stores of Louisiana, Inc., 245 La. 276, 158 So.2d 162, at page 171, as follows:
"The doctrine of res ipsa loquitur is a rule of evidence, the applicability of *79 which is to be determined at the conclusion of the trial. Plunkett v. United Electric Service, 214 La. 145, 36 So. 2d 704, 3 A.L.R.2d 1437; Gerald v. Standard Oil Company of Louisiana, 204 La. 690, 16 So.2d 233; Malone, Res Ipsa Loquitur and Proof by Inference, 4 Louisiana Law Review 70, 92.
"For the doctrine to be applicable, the circumstances shown by the evidence must be such as to warrant an inference, not of negligence only, but of defendant's negligence. This means that it must appear more probable than not that the injury was attributable to a violation of defendant's duty to plaintiff. Davis v. Hines, 154 La. 511, 97 So. 794; Prosser On Torts (2d Ed. 1955) § 42, pp. 204-206. See also Larkin v. State Farm Mutual Automobile Ins. Co. 233 La. 544, 97 So.2d 389.
"The test has been succinctly stated as follows: Do the facts shown suggest the negligence of the defendant, rather than other factors, as the most plausible explanation of the accident? Malone, Torts: Proof of Negligence, 19 Louisiana Law Review 335-336."
As stated in the landmark case of Larkin v. State Farm Mutual Automobile Ins. Co., 233 La. 544, 97 So.2d 389, the effect of the application of the doctrine of res ipsa loquitur is:
"The application of the rule does not, therefore, dispense with the necessity that the plaintiff prove negligence, but is simply a step in the process of such proof, permitting the plaintiff, in a proper case, to place in the scales, along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence, thereby obtaining an advantage and placing on the defendant the burden of going forward with proof to offset that advantage. When all the evidence is in, the question is still whether the preponderance is with the plaintiff. All that is meant by res ipsa loquitur is `that the circumstances involved in or connected with an accident are of such an unusual character as to justify, in the absence of other evidence bearing on the subject, the inference that the accident was due to the negligence of the one having control of the thing which caused the injury. * * *'"
With these legal principles in mind let us examine the facts of the present case. It is not disputed that there was an accident of such an unusual character that it would not have occurred unless someone was negligent. There was no evidence of any negligent mishandling of the carton by Mrs. James or the cashier or the bagboy or any other person. There was obviously some kind of a defect or weakness in the bottom of the carton. The evidence does not show exactly what was the nature or cause of this condition. Thus, the question becomes whether there is an inference of negligence on the part of the Coca-Cola Company, under the doctrine of res ipsa loquitur. To decide this question we must examine all of the circumstances relative to the construction of the carton, its handling and inspection by the Coca-Cola Company, the control which this company exercised over the carton and the possibility that some third person might have caused the defective or weakened condition.
A representative of the company which manufactured the cartons testified as to their strength and moisture resistant properties. There is no reason to infer that the carton was structurally defective.
However, as pointed out by the trial judge, the system of handling and inspecting the cartons by the Coca-Cola Bottling Company at its plant in Lake Charles was not such that a defective or weakened carton could not leave the plant full of cokes. The evidence shows that cartons were reused an average of three times, but in some instances a carton might be *80 used as many as six times. When a case of empty coke bottles in cartons arrived at the plant it was placed on a conveyor and rolled to the inspector. The wooden case contained four tight fitting paper cartons. Without removing the paper cartons from the wooden case the inspector first lifted the empty bottles out with a set of hooks. He then looked down into the cartons from above and removed only those which, from such a superficial examination, appeared to be cut, torn, worn, or cartons other than Coca-Cola. He did not remove the other cartons from the wooden case. As noted by the trial judge, it is entirely possible that if there was a frayed, worn, cut or weakened place on the bottom of a carton, or in a place where it could not be seen because of the 4-inch side on the wooden box, then the inspector would not see such a defect. No further inspection was made of the cartons at the plant.
When the filled cartons left the plant they were taken to Childs store in a delivery truck. At this store the Coca-Cola Bottling Company had constructed, owned and maintained its own display. The delivery man simply went in and checked to see how many cokes were needed to refill the shelves and then he went out to his truck and brought the cases in. The store manager checked only to see how many were being delivered. The truck driver then took the cokes back and placed them on the display shelves and did whatever straightening up and maintenance was necessary. Such deliveries were made three times a week.
The store manager and employees testified that the only time they tampered with or handled the cokes was on rare occasions, when the display became "messy", they would straighten it up. However, there is no evidence whatever that this was done in the present case by the store employees after the last visit by the delivery man. Deliveries were made on Mondays, Wednesdays and Fridays and this accident occurred on a Tuesday.
Of course, the defendant, Coca-Cola Bottling Company, argues it is possible that a customer of Childs did something to weaken the bottom of the carton. A delivery was made on Monday and this accident occurred the next Tuesday morning. Whatever a customer might have done to the carton had to be done in this short time. What could a customer have done to the carton? It is not argued that he could have spilled some liquid in the carton and weakened it, because the manufacturer's representative testified to the carton's great moisture resistant properties. It was tested to hold 90 pounds wet and 112 pounds dry. About the only thing a customer could have done in this short time was lift the carton out and cut or tear the bottom in some way. There is no testimony that this had ever happened before. Under all of the circumstances of this particular case we do not think this is a reasonable possibility. It is so much more reasonable and probable that the bottom of the carton was already defective when delivered to the store on Monday.
A most persuasive fact is the testimony of the delivery man himself that despite the inspection procedure used by his employer at the plant he carried extra cartons in his truck to replace defective ones. However, he too acknowledged that he didn't remove the cartons from the wooden case as he placed them in the store. Thus, he also would not have seen any defect hidden by the wooden box. The delivery man also admitted that he personally had experienced several instances of bottles falling out of defective cartons.
Under all of these circumstances it is our opinion that the doctrine or res ipsa loquitur is applicable to the Coca-Cola Bottling Company. The evidence does not show the reasonable possibility that there was any other cause for the bottom of the carton giving way than the neglect of this defendant to provide a carton suitable for the purpose of carrying 6 "King Size Cokes".
*81 The next issue is whether Childs is also liable. There is no evidence of any specific act of negligence on the part of any of the store's employees or customers. The issue then is whether res ipsa loquitur also applies to Childs. Counsel for Coca-Cola Bottling Company argues it is probable that the carton was damaged in the store by a customer or employee and the store had a duty to inspect the cartons for any such damage. A similar argument was made by Justice McCaleb in his dissenting opinion in Pilie v. National Food Stores of Louisiana, Inc., supra, but the facts of that case were much stronger for the plaintiff. There, a carton of Cokes, for some unknown reason, fell from a display as plaintiff walked along the isle. By a 4 to 3 decision, the court held res ipsa loquitur did not apply. The majority and concurring opinions point out the difficulty of applying the doctrine to self-service stores where customers have free access to the merchandise. The dissenting opinions found res ipsa loquitur was applicable and then stressed the fact that the store did not show it had any system of inspection for the safety of its customers to offset the inference of negligence on its part.
Even if we were to follow the theory of the dissenting opinions in the Pilie case, res ipsa loquitur would not be applicable here. It is a great deal more probable that a customer or employee of a self-service store might disarrange a stack of bottles than it is that they might damage the bottom of a Coca-Cola carton. For the reasons which we have already stated above, we agree with the trial judge it was improbable that the bottom of this carton was damaged by a customer or employee of the store. As to the duty of Childs to inspect, we point out that the Coca-Cola Company had the responsibility of maintaining the display. The obvious purpose of this arrangement was to enable Coca-Cola to maintain an attractive display which would entice more sales. Under this arrangement, surely there was no duty by the store to do more than protect its customers against obvious defects in the cartons. Childs would not be required to examine the bottoms of the cartons in detail. Some inspection of the display was made occasionally, as is shown by the testimony that it was straightened up if it became too "messy". Under all of the circumstances we do not think any inference can be reasonably drawn that Childs' customers or employees did or failed to do anything which caused the bottom of the carton to fall out.
The final issue is the quantum of damages awarded. The trial court awarded Mr. Robert H. James, husband of Mrs. Jean James, for loss of her wages as a school teacher, the sum of $12 per day for 31 days or a total of $372; for medical expenses, $486.80; for extra maid service, $27; making a total of $885.80. By answer to the appeal, Mr. James contends the loss of earnings should have been figured at $31.11 per day instead of $12 per day.
As a result of the laceration of her ankle June 2, 1962, and subsequent surgery for removal of scar tissue in January of 1963, the trial judge concluded Mrs. James lost 31 days from her work. The problem is somewhat complicated by the fact that following her ankle laceration in June of 1962 Mrs. James had to undergo a hysterectomy in January of 1963, and it was decided that while she was in the hospital for this more serious surgery the ankle would be excised for the removal of scar tissue. She used up seven days of her sick leave in 1962, and four days in January, 1963. She went on sabbatical leave at the start of the semester, for recuperation from both the histerectomy and the ankle surgery. The trial judge decided that at least four weeks (or a total of 20 working days) of this recuperative period was required by the ankle operation.
The evidence shows that Mrs. James was entitled to ten days sick leave for each school session and that leave could be accumulated up to a maximum of 25 days in a three-year period. We will not disturb the trial judge's finding that as a result of this *82 injury Mrs. James used a total of 11 days of her sick leave and 20 days of sabbatical leave. For all of these 31 days she was paid her full salary, less the sum of $12 a day which had to be paid to a day-by-day substitute teacher. The trial judge allowed only this $12 per day, for 31 days, as damages.
Citing the case of Vogt v. Hotard, 144 So.2d 714 (4th Cir.App. 1962, writ of certiorari denied) plaintiff contends that she was forced to use a total of 31 days of sick and sabbatical leave for which she should be compensated at her full rate of pay of $31.11 per day. Alternatively, plaintiff contends for 13 days sick leave at $31.11 per day and $12 per day for 18 days of sabbatical leave.
Certainly, under the theory of the Vogt case, plaintiff should be recompensed in full for the use of her accumulated sick leave, made necessary by this accident. We affirm the trial judge's finding that she thus used 11 days sick leave, but we think she must be allowed $31.11 for each of these days or a total of $342.21. However, sabbatical leave is not accumulated. If such leave is granted a teacher, for educational development or health or other personal reasons, she is paid her full salary less the $12 a day for a substitute, but she loses no rights to further leaves which might cause her monetary damages. We think the lower court correctly allowed only $12 a day for the 20 days of sabbatical leave, or a total of $240. The award for loss of earnings for both sick and sabbatical leave totals $582.21.
The district judge awarded Mrs. James the sum of $2,000 for her pain, suffering and disability. By answer to this appeal Mrs. James asked an increase to $3,000. The evidence shows the original laceration required 8 sutures and that she had to stay off of her ankle for two or three weeks. However, she later developed scar tissue which caused complications and required another incision. There is also evidence that the ankle was still "bothering her" up to the date of trial. Under the circumstances we do not think the trial judge abused his discretion in making this award. Gaspard v. Lemaire, 245 La. 239, 58 So.2d 149.
For the reasons assigned, the judgment appealed is amended by increasing the award to Mr. Robert H. James for the loss of wages of the community from the sum of $372 to the sum of $582.21, making the total award, as amended, to Mr. James the sum of $1,096.01. As thus amended the judgment appealed is affirmed.
Amended and affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.